Napoleon EMILY, Mary Margaret Emily and Lucy Ann Emily, Plaintiffs-Appellants,

v.

James R. BAYNE, Maude Bayne, Mercantile Trust Company, a Corporation, and Cornet & Zeibig, Inc., a Corporation, Defendants-Respondents.

No. 31344.

St. Louis Court of Appeals. Missouri.

Oct. 15, 1963.

Norman Barken, St. Louis, Sheldon D. Grand, Clayton, for plaintiffs-appellants.

Lashly, Lashly & Miller, John H. Lashly, William E. Rulon, Thompson, Mitchell Douglas & Neill, Courtney Shands, Jr., W. Stanley Walch, St. Louis, for defendants-respondents.

DOERNER, Commissioner.

This is an action for fraud and deceit. Plaintiffs seek to recover both actual and punitive damages because of false representations claimed to have been made by the defendants in connection with plaintiffs' purchase of certain real estate from the defendants James R. Bayne and Maude Bayne, his wife. Defendant Mercantile Trust Company was the sales agent for the Baynes, and defendant Cornet & Zeibig, Inc., acted as the real estate agent for plaintiffs. The jury returned a verdict in favor of plaintiffs and against all of the defendants for actual damages of $6,000 and punitive damages of $7,500, and judgment was entered accordingly. The defendants filed separate motions to set aside the judgment and to enter judgment in accordance with their respective motions for a directed verdict at the close of the evidence, as well as individual motions for a new trial. The court overruled the former motions but sustained the motions for a new trial on the grounds that certain instructions given on behalf of plaintiffs were erroneous. Plaintiffs appealed from that order.

The defendants, while defending the action of the trial court in holding the instructions erroneous, severally contend that the court erred in failing to direct a verdict for each of them at the close of the evidence, in accordance with their separate motions for a directed verdict filed at the close of the evidence. Whether or not

plaintiffs made a submissible case against all or any of the defendants is a basic question which we will decide under the circumstances here present. Bailey v. Interstate Airmotive, 358 Mo. 1121, 219 S.W.2d 333, 8 A.L.R.2d 710; Gill v. Mercantile Trust Co., Mo.App., 347 S.W.2d 420; Krueger v. Elder Mfg. Co., Mo.App., 260 S.W.2d 349. It is elemental that in passing on that question we view the evidence in the light most favorable to plaintiffs. Chailland v. Smiley, Mo., 363 S.W.2d 619.

The real estate involved in this litigation is known and numbered as 3305 Russell Avenue, in the City of St. Louis. It was originally constructed for use as a one-family residence, but at the time it was purchased by the Baynes in 1957 it had been converted into a multiple dwelling of eight units. After they bought the property the Baynes lived in one unit and rented out the remaining seven, two of which were in what is commonly called the basement. When the Baynes decided to sell they employed the Mercantile Trust, which has a real estate department, as their sales agent. Mercantile Trust placed an advertisement regarding the property in the February 1, 1959 publication of a St. Louis newspaper. Plaintiff Lucy Emily saw the advertisement and telephoned Mrs. Bernadine Murphy, a part-time saleswoman for defendant Cornet & Zeibig, a real estate firm. Mrs. Murphy, since 1953 or 1954, had undertaken to find a suitable piece of real estate for Miss Emily and her brother, plaintiff Napoleon Emily, but up to that time had never been able to do so. Through arrangements made with Mercantile Trust, Miss Emily and Mrs. Murphy inspected the property, apparently at some time in the first part of March, 1959. Both before and after that inspection Mrs. Murphy had been in correspondence about the Bayne's real estate with Mr. Emily, who resided in Kansas City. As a result, Mr. Emily came to St. Louis, sometime in March, 1959 and he, his sister, and Mrs. Murphy examined the building. After the inspection Mrs. Murphy volunteered to and did check the zoning at the City Hall. She

reported to both Miss Emily and Mr. Emily that the property was in a zone in which multiple dwellings were permitted.

The Baynes were asking either $31,500 or $32,500 for the property (both figures appear in the evidence). Plaintiffs submitted an initial offer, in an unstated amount, which the Baynes refused. Subsequently plaintiffs submitted a second offer of $27,500, incorporated in a sales contract dated April 6, 1959, which was accepted and signed by the Baynes on April 9. The sales contract was prepared by and is on a printed form of defendant Cornet & Zeibig. It contains the customary sales provisions, and, as the only special agreements typed in, the following:

"This contract contingent upon purchaser obtaining possession of one unit at time of closing this sale.

"Contract further contingent upon reaffirmation by Zoning Commission of zoning for this property being for apartments as represented."

The sale was closed on July 10, 1959, at the offices of the Title Insurance Corporation in St. Louis. Mrs. Murphy testified that as she, Miss Emily and Mr. Emily were walking to the parking lot immediately after the closing, Mr. Emily told her that Miss Emily didn't want the house and asked her to sell it. Mr. Emily denied that the conversation took place, but admitted that on July 17, 1959, only one week after the closing, he wrote Mrs. Murphy a letter in which he stated that Miss Emily did not like the property and that he would come to St. Louis on July 25 to make arrangements with Mrs. Murphy to place the property on the market.

During the early part of August, 1959, Miss Emily, at Mrs. Murphy's suggestion, went to the City Hall to obtain a " * * * permit to operate the house." Miss Emily testified that, " * * * they gave me a permit," but the record does not disclose the nature of the permit she received. Mr. Olin Morrison, a building inspector for the City of St. Louis, who was called as a wit-

ness by plaintiffs, stated that at the direction of his superior he inspected the property on August 7, 1959. Whether his inspection preceded or followed Miss Emily's visit to the City Hall is not clear from the evidence. In any event, following his inspection Mr. Morrison notified Miss Emily to make an application for a rooming house permit. She did so. He then made an inspection to determine whether the building complied with the so-called rooming house ordinance, and thereafter wrote Miss Emily recommending that various changes be made, including that, " * * * She was to vacate the two cellar units for occupancy * * *." Mr. Morrison next visited the building on November 23, 1959, ascertained that his prior recommendations had not been followed, and sent Miss Emily a second letter, " * * * requesting the same items to be done over again." Mr. Morrison further testified that no rooming house permit had been issued since the time of his first visit. On cross-examination he stated that his records did not show that any complaint had ever been made by the City against the Baynes because of the occupancy of the basement units.

When the Baynes acquired the property in 1957, and when the sale to plaintiffs was closed, the two dwelling units in the basement were rented. The tenants in one unit were Mr. and Mrs. Worster or Wooster, the brother-in-law and sister of Mrs. Bayne, who remained on until December 1, 1961, when they moved. The other tenant was named Adams, but when he moved is not disclosed by the evidence. Miss Emily testified that these two units were not rented at the time of the trial, and that the rental income from the property was then $315 per month.

Additional facts will be stated in the course of the opinion.

■ The gist of plaintiffs' charge of misrepresentation is contained in the following excerpt from their petition:

" '2. Plaintiffs were tricked, cheated, and defrauded by the defendants and each of them, who knowingly and wilfully represented to plaintiffs that said "apartment building" was acceptable under the ordinances and regulations of the City of St. Louis, more particularly Ord. Number 48338, in that it was represented to plaintiffs by defendants and each of them that there were eight apartments in said "apartment building" which could be rented in compliance with said ordinances and regulations for a total monthly rental of $415.00, while, in actuality, inspection by the Department of Public Safety of the City of St. Louis reveals that this is not the case, * * *.' "

The eight elements which must be proven in an action for fraud and deceit, the claim here pleaded, are so well known as not to require enumeration. Bayer v. American Mutual Casualty Co., Mo., 359 S.W.2d 748; Lowther v. Hays, Mo., 225 S.W.2d 708; Wood v. Robertson, Mo., 245 S.W.2d 80; 37 C.J.S. Fraud § 3, p. 215. The first of those elements is that of a representation. Each of the defendants contend that the evidence did not show that he, or anyone on his behalf, made the representations charged in plaintiffs' petition. If it did not, then the motion for a directed verdict of that defendant at the close of the case should have been sustained, for a failure to establish anyone of the essential elements is fatal to a recovery by plaintiffs. Powers v. Shore, Mo., 248 S.W.2d 1; Lowther v. Hays, supra; Orlann v. Laederich, 338 Mo. 783, 92 S.W.2d 190. It seems hardly necessary to add that the burden of proving the charge of fraud was on plaintiffs who asserted it. Shepherd v. Woodson, Mo., 328 S.W.2d 1; Bayer v. American Mutual Casualty Co., supra; Hardwicke v. Hamilton, 121 Mo. 465, 26 S.W. 342.

Because the evidence is different regarding each defendant, the respective contentions of Mercantile, the Baynes, and Cornet & Zeibig will be considered separately, in that order.

■ The essence of the representation which plaintiffs alleged was made by the

defendants was that the building contained eight apartments which could be rented in compliance with the ordinances and regulations of the City of St. Louis. As to defendant Mercantile, the only representation shown to have been made by it, prior to the closing, was the advertisement it inserted in the newspaper on February 1, 1959, which read:

"HOME AND INCOME
3305 Russell. Be sure to see this 8-family on 90 ft. corner lot; new wiring; fire escapes; new furnace; excellent yield. Call WY 1-2580.

MERCANTILE TRUST CO.
Real Estate Dept. CE 1-3500"

These statements were factual, and they were true. The building did contain eight dwelling units, which the plaintiffs saw and inspected during their visits to the property. It was on a 90 foot corner lot, as shown by the evidence, including the general warranty deed introduced by plaintiffs. The advertisement did not even characterize the dwelling units as "apartments," as plaintiffs alleged. Obviously there was no reference in the advertisement to any ordinance or regulation of the City of St. Louis, much less to all of them. There may be instances in which an advertisement is so worded as to be misleading. Brown v. Sloan's Moving and Storage Co., Mo., 274 S.W.2d 310; 296 S.W.2d 20. But a fraudulent representation should not be wrung from a statement by enlarging its meaning through a strained interpretation or unjustifiable augmentation. Ray County Sav. Bank v. Hutton, 224 Mo. 42, 123 S.W. 47. That case holds, in fact, that in deciding whether a statement was a misrepresentation " * * we should solve all doubts in favor of good faith * * *."

The only direct contact between the plaintiffs and defendant Mercantile was at the closing of the sale on July 10, in the offices of the title company. There were present on that occasion Miss Emily; Mr. Emily; Mrs. Murphy; Mrs. Helen Smith, then closing officer of Cornet & Zeibig; Elmer Kulla, sales closer in the real estate department of Mercantile; Maurice Wright, president of the Security Home Savings and Loan Association, which made plaintiffs a loan on the property; and Norman Struss, of the title company. When Mr. Emily testified he could not recall the name of Mercantile's representative, but in answer to questions propounded by his counsel, he related:

"Q. Were any statements made by the Mercantile representative at the time of closing?

"A. I called their attention to the paragraph of this contract and I asked—I called their attention to this clause in the contract and they reaffirmed that the zoning was, it was in conformity with the zoning.

"Q. Did they say anything else about the building meeting any other requirements?

"A. That it met all requirements, met all city zoning requirements and so on.

"Q. Did Mrs. Murphy make any statement?

"A. They both did, Cornet and Zeibig and Mrs. Murphy—I mean Mercantile."

It will be noted that when first asked what the representative of Mercantile had said Mr. Emily referred only to zoning, and that even when pressed by his counsel to relate any other statements about the building meeting other requirements the witness returned to the subject of " * * * city zoning requirements and so on." There is no dispute about the fact that the property is in a zone for apartment houses and other multiple dwellings. Mrs. Murphy had checked a second time at the zoning offices and had written Mr. Emily to that effect, on April 20, after the contract of sale was signed but before the closing.

Of the seven persons present, only one, Norman Struss of the title company, did not appear as a witness. Of those who did, not a single witness, including Miss Emily, one of the plaintiffs, corroborated Mr. Emily. However, viewing the evidence in the light most favorable to plaintiffs, as we are required, and assuming that the representative of defendant Mercantile made the statement that the building met all city zoning requirements, "and so on," can we either interpret or interpolate into that nebulous phrase the representation, alleged in plaintiffs' petition, that the eight apartments in the building could be rented in compliance with all of the ordinances and regulations of the City of St. Louis? For the reasons given in connection with the advertisement, we think not.

▬ Further, assuming that either the advertisement or the statement of defendant Mercantile's representative could be interpreted to accord with plaintiffs' allegations, the purported representation would have been no more than the mere expression of a legal opinion. A statement of what the law will or will not allow to be done is a matter of opinion, albeit on a legal matter. Williston on Contracts, Rev. Ed., Vol. 5, Sec. 1495, p. 4171; Fish v. Cleland, 33 Ill. 237. It is the rule in Missouri,[1] as it is generally,[2] that a representation concerning a matter of domestic law ordinarily will not support an action for fraud and deceit. It has been held that representations similar to that claimed to have been made in this case were mere ex-

pressions of a legal opinion, and not actionable.[3] The general rule that an action for fraud and deceit cannot be predicated upon a representation regarding a matter of domestic law is subject to two well-recognized exceptions: (1) Where there is a relation of trust and confidence between the parties, as in Easton-Taylor Trust Co. v. Loker, Mo.App., 205 S.W. 87; and (2), where one party is possessed, or professes to be possessed, of a superior knowledge of the law and takes advantage of the other party's ignorance of the law to mislead him, as in Security Savings Bank v. Kellems, 321 Mo. 1, 9 S.W.2d 967 and Hartley Realty Co. v. Casady, Mo.App., 332 S.W.2d 291. Neither exception is applicable here. Plaintiffs and defendants Bayne and Mercantile dealt at arms length, Ewing v. Miller, Mo., 335 S.W.2d 154. There was no confidential relationship between them. Wilhoit v. Fite, Mo., 341 S.W.2d 806. Nor was there any evidence that those defendants had or professed to be possessed of a superior knowledge of the law and thereby misled defendants. Security Savings Bank v. Kellems, supra; Hartley Realty Co. v. Casady, supra.

▬ For the foregoing reasons we are of the opinion that plaintiffs failed to make a submissible case against defendant Mercantile Trust Company, and that the motion of that defendant for a directed verdict at the close of the evidence should have been sustained.

▬ As to Mr. and Mrs. Bayne, the only representation claimed to have been

---

1. Security Sav. Bank v. Kellems, 321 Mo. 1, 9 S.W.2d 967; Dalrymple v. Craig, 149 Mo. 345, 50 S.W. 884; Easton-Taylor Trust Co. v. Loker, Mo.App., 205 S.W. 87; Allgood v. Tarkio Elec. & Water Co., 222 Mo.App. 964, 6 S.W.2d 51; Gilmore v. Ozark Mut. Assoc., Mo.App., 21 S.W. 2d 633; Bondurant v. Raven Coal Co., Mo.App., 25 S.W.2d 566; Thompson v. Kansas City, C. C. & St. J. Ry. Co., 224 Mo.App. 415, 27 S.W.2d 58; Sewell v. Ladd, Mo.App., 158 S.W.2d 752; Hartley Realty Co. v. Casady, Mo.App., 332 S.W.2d 291.

2. Williston on Contracts, Rev.Ed., Vol. 5, Sec. 1495, p. 4171; 37 C.J.S. Fraud § 55, p. 323; 23 Amer.Jur., Fraud and Deceit, Sec. 45, p. 809.

3. Abraham v. Wechsler, 120 Misc. 811, 200 N.Y.S. 471, aff. 210 App.Div. 876, 206 N.Y.S. 877; Montkane Funds, Inc. v. Ruff, Sup., 57 N.Y.S.2d 208, aff. 269 App. Div. 1021, 59 N.Y.S.2d 400; Mionie v. 341 Grand Street Corp., City Ct., 74 N.Y.S.2d 69; Williams v. Horton Realties, Inc., Sup., 121 N.Y.S.2d 552, aff. 283 App. Div. 889, 129 N.Y.S.2d 766; Metzger v. Baker, 93 Colo. 165, 24 P.2d 748.

made by either of them to plaintiffs was Mr. Emily's testimony on direct examination of a conversation which occurred during his inspection of the property. We quote his testimony in full:

"Q. What statement did the Baynes make when you looked at the property?

"A. They said it was in good condition.

"Q. Did they make any statement in regard to the income of the property?

"A. Yes, sir.

"Q. If you can remember, what were those statements?

"A. They said the income totalled over four hundred dollars, approximately four fifteen, I believe, per month.

"Q. When you purchased this property did you rely upon those statements?

"A. Yes, sir, that's right.

"Q. And upon other statements made by the Baynes?

"A. That's right."

No other statements were attributed by Mr. Emily to the Baynes. There is no dispute about the fact that the property was then producing the rental stated. Mrs. Murphy, who appeared as a witness on behalf of defendant Cornet & Zeibig, was asked whether she had discussed with the Baynes " * * * anything with reference to the zoning or the building code or the city regulations or anything of that sort?" Her answer was that she discussed only zoning, that she asked the Baynes whether the property was zoned for multiple dwellings and that they said it was. She specifically denied that there was any conversation relating to the city building code or regulations or ordinances or anything of that kind. The foregoing is all of the evidence re-

garding statements made by the Baynes. It is obvious that as to those defendants the evidence wholly fails to support the allegations of false representations pleaded in plaintiffs' petition. Their motion for a directed verdict at the close of the evidence should also have been sustained.

The evidence, however, is far stronger as to defendant Cornet & Zeibig. On February 16, 1959, before Mr. Emily had come to St. Louis to inspect the Baynes' property, Mrs. Murphy wrote him a letter in which she said that she had located a converted residence on Russell, a magnificent job, which contained eight apartments with eight kitchens and eight baths. On February 28 she wrote him again, saying that she and Miss Emily had seen the property and enclosed a statement of the rentals, which she declared were definitely too low and should be raised. She again wrote him on March 5, giving him an analysis of the income (for eight units), the expenses, the method and cost of financing, and the net return. Sometime after that date (the exact time is not in evidence) Mr. Emily came to St. Louis and inspected the property. Mr. Emily testified that he owned no real estate and had had no experience in real estate. He had been seeking a property which would serve as a home and source of income for his sister. Mrs. Murphy was aware of his requirements and had been searching for several years for such a building. He testified that during the inspection trip Mrs. Murphy made the following statements:

"Q. When you viewed the property did Mrs. Murphy make any statement?

"A. The property was in good condition and conformed to the zoning and other regulations.

"Q. What experience have you had in real estate, Mr. Emily?

"A. None.

"Q. Do you own any real property?

"A. None.

"Q. Did you indicate that to Mrs. Murphy?

"A. Yes, sir. I told her that I relied on her to see that the property met the city requirements as to zoning and so on."

On cross-examination she admitted that she knew the plaintiffs were relying on her as their agent in the sale, and knew that they had placed their complete confidence in her. After his visit Mrs. Murphy prepared, or had prepared, the contract of sale dated April 9, which listed therein eight apartments and the rentals thereof. Thereafter, on April 20, she wrote Mr. Emily as follows:

"'The zoning on the property was checked at City Hall, and it is as represented. However, the zoning office suggested that at closing an occupancy permit be obtained, and kept available at time of any inspection by various city departments.'"

Although she was thereby put on notice that other legal regulations existed regarding the use of multiple dwellings, she did nothing more. Nevertheless, when Mr. Emily inquired of her at the closing whether the property met the " * * * city zoning requirements and so on," she assured him that it did.

Defendant Cornet & Zeibig's contention that the plaintiffs failed to make a submissible case as to it, like all Gaul, is divided into three parts. The first argument advanced is that the evidence failed to establish any representation concerning Ordinance No. 48338, the so-called rooming house ordinance. It is true that the evidence did not show that Mrs. Murphy made a statement in which she specifically referred to that ordinance. We do not think it was essential to plaintiffs' case to prove that she did. The gist of plaintiffs' allegation was that it was represented to them that the building contained eight apartments which could be rented in compliance with the ordinances and regulations of the City of St. Louis governing multiple dwellings. As we construe plaintiffs' petition the phrase: " * * * more particularly Ord. Number 48338, * * *" was employed to specify the ordinance which the pleader believed was applicable, rather than an allegation of what was actully represented. Furthermore, plaintiffs were not required to prove the representations alleged verbatim et literatim, but only representations which were substantially the same as those alleged; that is, statements having the same general meaning and effect. Wilson v. Murch, Mo.App., 354 S.W.2d 332.

The evidence did establish, as this defendant recognizes, that in her letter of February 16 to Mr. Emily Mrs. Murphy described the building as containing eight apartments with eight kitchens and eight baths; that on one occasion she represented to Mr. Emily that the property " * * conformed to the zoning *and other regulations*" (emphasis supplied); that in her letter of April 20 to Mr. Emily she wrote that the property was zoned for multiple dwellings and that the zoning office had suggested that an occupancy permit be obtained at the closing; and that at the closing of the sale she assured Mr. Emily that the building, " * * * met all city zoning requirements and so on."

█ Whether these statements were sufficient to establish the representation alleged so as to make a submissible case must be judged in the light of the relationship between plaintiffs and Cornet & Zeibig, as well as against the background and in the context in which they were made. The relationship between plaintiffs, the clients, and Cornet & Zeibig, their real estate agent, was one involving trust and confidence. Klika v. Albert Wenzlick Real Estate Co., Mo. App., 150 S.W.2d 18; Acy v. Inland Security Co., Mo.App., 287 S.W.2d 347. That fact alone is sufficient to make a difference as to " * * * the degree of proof required * * *" to make a submissible case for fraud and deceit, as well as " * * a difference as to the form in which the misrepresentation is put * * *," Monsanto

Chemical Works v. American Zinc, Lead & Smelting Co., Mo., 253 S.W. 1006, 1009. Mrs. Murphy was cognizant of the income producing purpose for which plaintiffs were seeking to purchase real estate, knew of their lack of knowledge and experience in such matters, and was fully aware of the plaintiffs' reliance on her to see that the multiple dwelling complied with all requirements of the city governing such property. In 37 C.J.S. Fraud § 8, p. 224, it is said that, " * * * In its generic sense, a false representation is anything, short of a warranty, which produces on the mind of another person a false impression conducive to action. * * * " In the light of the relationship between the parties and the background against which they were made, we think the statements made by Mrs. Murphy might reasonably be considered as a representation that produced on the minds of the plaintiffs the impression that the property contained eight apartments which could be rented in compliance with the city's ordinances and regulations governing multiple dwellings.

█ Such a representation, of course, was one regarding a matter of domestic law, and as we have previously stated, the general rule is that an action for fraud and deceit cannot be predicated upon a misrepresentation of domestic law. But that rule is no bar to this action, since the conceded relationship of trust and confidence between the plaintiffs and defendant Cornet & Zeibig bring it within the ambit of one of the recognized exceptions to the rule. Easton-Taylor Trust Co. v. Loker, supra.

The second and third points relied on by Cornet & Zeibig both deal with Ordinance Number 48338, the rooming house ordinance, and may therefore be considered together. It is contended, on the one hand, that there was no proof that the building was a "rooming house", as that term is defined in Ordinance Number 48338; and on the other, that even if it is assumed that the ordinance applied, plaintiffs failed to prove that the two units in the cellar or basement were occupied in violation of the ordinance. Both of these contentions are premised on the supposition that plaintiffs' claim was based exclusively on Ordinance Number 48338, a fallacy with which we have already dealt. The first argument is also predicated on the contention of Cornet & Zeibig, which it endeavored to prove, that the building was in fact an apartment house and therefore subject to Ordinance No. 44513 governing apartment houses, a part of which was introduced in evidence.

In the interest of brevity we need not dwell on the technical distinctions between a rooming house and an apartment house as established by the two ordinances. It will suffice to say that we agree with Cornet & Zeibig's argument that the dwelling units are either "light housekeeping units" or "apartments." We also agree with it that the primary difference between the two is that in order to be an apartment the partitions must be constructed of one-hour fire resistant materials. Lastly, we further agree that the evidence did not establish the nature of the materials which comprise the partitions, so that it is impossible to accurately determine whether the dwelling units are light housekeeping units or apartments. But we do not agree with the defendants' conclusion that the plaintiffs therefore failed to make a submissible case.

Actually, the question of whether Ordinance No. 48338 or No. 44513 governs the building is academic. This for the reason that the evidence was sufficient for the jury to find that the two dwelling units could not be used for human habitation regardless of which applied. In the interests of further restricting the length of this unavoidably long opinion, it is sufficient to say that the two units could not be used for human habitation if they were in a "cellar," but that they could be so occupied if they were in a "basement." Ordinance No. 48338 defines a basement as, "A story having part but not more than one-half (½) its height below grade. * * * The ceiling shall be not less than 7 feet 6 inches

(7′6″) high." Ordinance No. 44513 likewise requires that the ceiling of a basement dwelling unit must be 7 feet, 6 inches high and that the ceiling, "shall be at least three feet six inches above the surface of the street *or ground* outside of or adjoining the room." (Emphasis supplied.)

In an effort to show that the two dwelling units involved are apartments rather than light housekeeping units, and that they could be used for human habitation, the defendant developed from the city building inspector, Mr. Morrison, plaintiffs' witness, that the height of the ceiling was 7 feet 8 inches. Mr. Morrison stated that he could not give the difference in elevation between the ceiling and the surface of Russell Avenue, on which the property fronts. He did say, however, that the house was on a lot which was raised above the street level. Defendant's expert real estate appraiser, Arthur A. Schneider, testified that the ceiling was 7 feet 6 inches high, and that the elevation of the ceiling was 4 feet above the surface of Russell Avenue. However, on cross-examination he admitted that he had made his measurement from the sidewalk rather than from the surface of the roadway; admitted that there was a slight terrace in the front yard; and also admitted that the ground level was one foot above the sidewalk. Giving defendant the benefit of Mr. Morrison's measurement of 7 feet 8 inches as the height of the ceiling it is nevertheless apparent that the elevation of the ceiling would be only three feet above the " * * * ground outside of or adjoining the room," and hence would not be legally habitable under the apartment house ordinance. Also, it would not meet the requirements of a "basement" under the rooming house ordinance, because more than one-half of its height would be below ground. According to plaintiffs the benefit of the favorable evidence adduced from defendants' side of the case, as we must, there was sufficient evidence to submit to the jury the issue of whether the two dwelling units could be used for human habitation under either ordinance.

■ It follows that the plaintiffs made a submissible case as to defendant Cornet & Zeibig, and that its motion for a directed verdict at the close of the evidence was properly overruled.

■ We turn, now, to the matter of plaintiffs' appeal insofar as it concerns defendant Cornet & Zeibig. In their petition plaintiffs pleaded that the representations made by the defendant were false, and that the defendant knew they were false when it made them. In their Instruction No. 3, their verdict directing instruction against defendant Cornet & Zeibig, plaintiffs submitted the case to the jury upon the alternate theory that Cornet & Zeibig made the representations knowing that they were false, or knowing that it did not know whether they were false or true. The court held that the instruction was erroneous because the alternative scienter was not embraced within the pleadings. Whether or not it was embraced within the pleadings (and on that score see Luikart v. Miller, Mo., 48 S.W.2d 867), the instruction was prejudicially erroneous on other grounds. It is, of course, not necessary, in order to make out a submissible case of fraudulent representation, to prove that the defendant had actual knowledge that the facts stated by him were false; it will suffice if it is shown that he made a particular representation with the consciousness that he was without knowledge as to their truth or falsity, when, in fact, they were untrue. Luikart v. Miller, supra; Wilson v. Murch, Mo. App., 354 S.W.2d 332; Jos. Greenspon's Son Pipe Corp. v. Hyman-Michaels Co., Mo. App., 133 S.W.2d 426. This does not mean, however, that the plaintiff can submit an instruction on both theories of scienter when there is no evidence of actual knowledge by the defendant. Jos. Greenspon's Son Pipe Corp. v. Hyman-Michaels Co., supra. As stated in that case (133 S.W.2d 426, 429):

"The direction to the jury in this instance to return a verdict for plaintiff if they found, among other things, that the representation, if and when

made by defendant, was false 'and known by the defendant to be false', had the consequence of telling them that there was a basis in the evidence for such a finding; and since the two hypotheses of scienter were submitted in the alternative, we cannot say that the jury did not purport to find under the one as to which there was no evidence rather than under the one which was properly supported in the proof. The case at best was close upon the facts; and with the result in the case depending primarily upon a question of veracity as between Greenspon and Rosenthal, it was highly prejudicial to defendant to have the jury charged, in effect, that the evidence would support a finding that Rosenthal had uttered a deliberate falsehood."

In the instant case there was no evidence that Mrs. Murphy or Cornet & Zeibig had actual knowledge that the two apartments did not comply with the city's ordinances. In fact, the only evidence, that of Mrs. Murphy, was to the contrary, and for the reasons given in Greenspon's, supra, the instruction was prejudicially erroneous.

Other points regarding plaintiffs' verdict-directing instructions, which defendant maintains also entitled it to a new trial, need not be discussed since such matters may be modified upon a re-trial of the case.

For the reasons stated, the plaintiffs' appeal should be dismissed, and the order granting defendant Cornet & Zeibig, Inc., a new trial should be affirmed; the cause should be remanded with directions to set aside the order granting a new trial to defendants James R. Bayne, Maude Bayne, and Mercantile Trust Company, and to enter a judgment for those defendants; all at plaintiffs' cost. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion by DOERNER, C., is adopted as the opinion of this court. Ac-

cordingly, plaintiffs' appeal is dismissed and order granting defendant Cornet & Zeibig, Inc., a new trail is affirmed; cause is remanded with directions to set aside the order granting a new trial to defendants James R. Bayne, Maude Bayne, and Mercantile Trust Co., and enter a judgment for those defendants, all at plaintiffs' cost.

RUDDY, P. J., WOLFE, J., and WILLIAM M. KIMBERLIN, Special Judge, concur.