JOSEPH STEINGER, Appellant, v. GEORGE R. SMITH, ARTHUR L. LOCATELL, HERBERT L. GLASER, WILLIAM A. GAUVIN, DONALD DUBAIL and TOWER GROVE BANK & TRUST COMPANY, a Corporation, Respondents.—No. 40414.—213 S. W. (2d) 396.

Division One, July 12, 1948.

Rehearing Denied, September 13, 1948.

40

*Bernard Steinger* and *James T. Blair, Jr.,* for appellant.

*James V. Dunbar* and *A. E. L. Gardner* for Arthur L. Locatell, Herbert L. Glaser, William A. Gauvin and Tower Grove Bank & Trust Company, *Kerth & Schreiber*, by *A. H. Kerth* for George R. Smith, Jr.; *Kerth & Schreiber* of counsel, and *Charles R. Judge* for Donald Dubail, respondents.

[397] VAN OSDOL, C.—Action to recover $726,175 actual and $100,000 punitive damages. Plaintiff has appealed from the judgment rendered on a directed verdict for defendants.

Plaintiff's action is based on an alleged conspiracy to defraud whereby, it is alleged, plaintiff was induced to assign his one-half interest (of alleged value $726,175) in the capital stock of two corporations to defendant George R. Smith, Jr., for the unconscionable sum of $5000.

There was evidence introduced tending to show that June 25, 1943, plaintiff and defendant George R. Smith, Jr., had executed a note payable on demand ("and if no demand be made, then on the 26th day of June, 1944") for $68,000 payable to the defendant Tower Grove Bank & Trust Company, hereinafter referred to as "Trust Company." The note was for money borrowed from Trust Company to pay for the capital stock, to settle certain obligations, and to improve the physical properties of two corporations, Mount Hope Ceme-

tery & Mausoleum Company and Community Mausoleum Company, which capital stock the plaintiff and defendant Smith, as copartners, had contracted May 11, 1942, to purchase from "Family Investment" for a consideration of $45,000.

Prior to the execution of the contract of purchase, plaintiff and defendant Smith had become acquainted while both were employed in the sales department of a manufacturing company. In the purchase of the corporate stock, plaintiff had contributed $5000; and defendant Smith had contributed his efforts in the consummation of the contract of purchase. The negotiations for the $68,000 loan were instituted by plaintiff who had theretofore transacted business with Trust Company and had known defendant William A. Gauvin, Trust Company's trust officer. The defendants Locatell and Glaser are respectively president and loan officer of Trust Company. Defendant Dubail became attorney for the copartnership upon defendant Locatell's suggestion.

When the $68,000 note was executed the "controlling" stock of the two corporations was pledged as collateral, and the corporations executed a note for $144,000 secured by deed of trust on the cemetery and mausoleum properties. Two other notes were executed by the corporations, and endorsed by plaintiff and defendant Smith, one for $10,000 and one for $80,000. The latter three notes were also pledged as security for the $68,000 indebtedness.

The partners, plaintiff and defendant Smith, until about November 5, 1943, engaged in the management of the cemetery and mausoleum properties, and in the sale of cemetery lots and crypts in the mausoleums. April 1, 1943, there were approximately 700 unsold crypts in the mausoleums. The selling price per crypt varied from $500 to $3125. There were "approximately 7500 to 7800" unsold lots of "six graves." The sales price was $50 per grave. The partners shared the duties of transacting the business of their adventure according to their own arrangement whereby plaintiff remained upon the cemetery properties and there arranged sales of crypts and lots, and defendant Smith traveled over the city of St. Louis in encouraging and consummating sales. Plaintiff testified that after the first twelve months' operation "we had a $14,000 profit, after paying all expenses" and paying $5000 to "Family Investment" on the purchase price of the properties. All seemed well until about October 7, 1943, when friction developed between the partners. According to plaintiff's testimony, defendant Smith became "very absentminded" and expressed the wish to sell his interest and "to get out" of the business. Plaintiff went down to the bank and told defendant Gauvin, "I don't know what is wrong with George Smith." The officers of defendant Trust Company requested plaintiff and defendant Smith to attend a conference at the offices of the Trust Company concerning the affairs of the copartnership.

[398] The conference was called by defendant Gauvin for 3:00 o'clock the afternoon of November 5th. Plaintiff, defendant Smith, and defendants Locatell, Gauvin, Glaser and Dubail were present. Plaintiff testified defendant Smith charged plaintiff with having made "phoney deals" and with having shown the "phoney deals" on statements to the bank; and there were other accusations and counteraccusations, whereupon, according to plaintiff,

"Mr. Locatell said 'I don't like the way this thing is going. I am going to give you two days to bring that $68,000 in here. You have that $68,000 in here Monday morning by 9:30. If it is not in here you are going to be paying deficiencies for the rest of your life on this deal!'

"Q. Was anything said about what was going to happen to your interest in that stock?

"A. He said 'We know what to do. We are old time bankers. We have your collateral. We will take it and sell it for any price we can get. We've got it. What have you got?' I said 'Mr. Locatell, wouldn't you wait until Wednesday?' Monday morning at 9:30, why here it was 5 o'clock Friday night when the meeting was over and I said 'Where am I going to get the money by then? We have only half day banking hours tomorrow and I have to be back Monday morning at 9:30?' And Mr. Smith jumped up and said 'I can get the money to pay the bank, I will give you $5,000 to get out.' I said 'You will give me $5,000? Why, George, I put in $5,000 and we made $14,000 profit last year, we made that in the last 12 months on our books, and besides we have a couple of million assets!' He said 'That's what I will give you and if you don't take it, you will be paying deficiencies like Mr. Locatell told you, for the rest of your life.' "

Plaintiff thereafter and on the same day agreed in writing to sell his interest in the two corporations to defendant Smith for $5000, of which $50 was then paid, the balance to be paid within 5 days. The agreement further provided,

"This sale shall include the interest of the undersigned in and to any and all of the collateral which is on deposit at the Tower Grove Bank and Trust Company, which collateral is held by said Bank on a note signed by the said George R. Smith, Jr., and the undersigned for the sum of $68,000; it being understood that the sale herein being only conditional upon the complete release of the undersigned of any and all liability on the aforesaid note of $68,000."

The following November 9th plaintiff resigned as director and secretary-treasurer of the cemetery and mausoleum corporations, assigned all of his interest in the partnership to defendant Smith, and received the balance of payment, $4950. It seems defendant Smith had borrowed this money on November 7th from defendant Locatell and had not paid such personal debt at the time of trial.

44

Plaintiff-appellant contends the trial court erred (1) in excluding evidence, and (2) in directing a verdict for defendants.

It is the theory of plaintiff that defendant bank had the legal duty to give notice and advertise the sale of the collateral; that the defendant Locatell's statement the bank could take the collateral and sell it was, in effect, a representation the bank could make disposition of the collateral without notice or advertisement of the sale thereof, which statement, and the statement that plaintiff would be paying deficiencies all his life, were actionable misrepresentations of law and fact.

Plaintiff and defendant Smith had signed an agreement with Trust Company relating to the collateral pledged to secure the $68,000 note, Paragraph 6 of which agreement provided as follows,

"Upon the maturity of any indebtedness of the undersigned, including this note, the Trust Co. may . . . without demand, advertisement or notice, sell, at public or private sale, or at any exchange or brokers' board, at such prices as it may deem best and either for cash or on credit, or for future delivery any or all securities or property of any kind by it as collateral security or on which it may have a lien for the indebtedness of the undersigned, as hereinbefore provided . . . "

If it were assumed the representations made by defendants were false and the shown facts otherwise demonstrated actionable fraud (see elements of actionable [399] fraud, Jeck v. O'Meara, 343 Mo. 559, 122 S. W. 2d 897), the trial court erred in refusing to permit plaintiff to testify he believed and relied on the representations. Notwithstanding an objection that such testimony of plaintiff would amount to a conclusion of the witness-plaintiff, his belief of and reliance on the representations were facts peculiarly within his own knowledge and were hardly susceptible of direct proof in any other way. Brown v. Adams Transfer & Storage Co., Mo. App., 31 S. W. 2d 117; Scott v. Haynes, 12 Mo. App. 597; 37 C. J. S., Fraud, Sec. 109, pp. 421-422. See generally Vol. II, Jones Commentaries on the Law of Evidence, 2d Ed., Sec. 709, p. 1328; and Vol. II, Wigmore on Evidence, 3d Ed., Sec. 581, p. 714 et seq.

The statements of Locatell quoted supra, however, in our opinion, do not amount to fraud. It is considered essential to a conspiracy to defraud that there be some designed and fraudulent artifice employed. Medich v. Stippec, 335 Mo. 796, 73 S. W. 2d 998; 15 C. J. S., Conspiracy, Sec. 9, p. 1004. The gist of the claim is not the conspiracy, but the wrong (fraud is the charge in the instant case) done by acts in furtherance of the conspiracy resulting in damage to plaintiff. Kansas City v. Rathford, 353 Mo. 1130, 186 S. W. 2d 570; Shaltupsky v. Brown Shoe Co., 350 Mo. 831, 168 S. W. 2d 1083; Seegers v. Marx & Haas Clothing Co., 334 Mo. 632, 66 S. W. 2d 526. Plaintiff concedes the general rule that a misrepresentation as to a

matter of law will not constitute remediable fraud, but plaintiff relies upon those exceptions to the general rule applicable where there is a relation of trust and confidence or where the person making the representation takes advantage of his superior knowledge of the law. Plaintiff cites the following cases in support of his position, Security Sav. Bank v. Kellems, 321 Mo. 1, 9 S. W. 2d 967 (a lawyer for plaintiff had misrepresented to a debtor's wife the legal effect of her signature on her husband's note); Sewell v. Ladd, Mo. App., 158 S. W. 2d 752 (the misrepresentation of law was not actionable since there was no confidential relation; plaintiff was a business man of wide experience, and the person who was alleged to have made the representation was a banker); Thompson v. Kansas City, C. C. & St. J. R. Co., 224 Mo. App. 415, 27 S. W. 2d 58 (a settlement was a complete bar to the action, the settlement was procured by a lawyer, but plaintiff did not rely on the statement of the lawyer); Gilmore v. Ozark Mut. Ass'n., Mo. App., 21 S. W. 2d 633 (in harmony with the general rule); Allgood v. Tarkio Electric & Water Co., 222 Mo. App. 964, 6 S. W. 2d 51 (in harmony with the general rule); Easton-Taylor Trust Co. v. Loker, Mo. App., 205 S. W. 87 (the misrepresentation of a matter of law was made by one who bore a confidential relation to defendant Marie Loker who was ignorant and unversed in such matters). In the instant case Locatell is a man of years of experience in the banking business. However, plaintiff is a man of wide business experience; he had been a salesman and a sales manager of various mercantile establishments; he was a partner in the operation of an automobile sales business in St. Louis "about 7 or 8 years"; and for several years preceding the purchase of the cemetery and mausoleum properties, plaintiff was vice-president and general manager of a manufacturing corporation, at a salary of "between $10,000 and $12,000 a year." No evidence was introduced tending to show defendant Locatell bore a fiduciary relation to plaintiff. And we have not as yet examined the question whether defendant Locatell's statements were misrepresentations.

In the case of Mercantile-Commerce Bank & Trust Co. v. Kieselhorst Co., 350 Mo. 30, 164 S. W. 2d 342, this court makes a study of the rights of a pledgee-bank to avail itself by sale of collateral pledged to secure an obligation due the bank and of the right of a pledgee-bank to thereafter recover a deficiency judgment. The provisions of the agreement relating to sale of collateral in the note involved in that case were in substance quite like the provisions of Paragraph 6 of the agreement relating to sale of collateral involved in the instant case in so far as the respective agreements provided for sale of collateral without advertisement or notice. The rights and duties of a pledgee-bank in such circumstances as examined by this court in the Mercantile-Commerce Bank & Trust Company [400] opinion do not substantiate plaintiff's contention that defendant Loca-

tell misrepresented the pledgee-bank's legal rights under the facts shown by plaintiff's evidence in the instant case. Defendant Locatell, though urgent and harsh in demanding payment of the note, was within the rights of the defendant bank in making the demand, and in threatening the sale of the collateral. Locatell was acting within the rights of the bank as provided in the collateral agreement which plaintiff had entered into and signed. Mercantile-Commerce Bank & Trust Co. v. Kieselhorst Co., supra; 49 C. J., Pledges, Sec. 209, pp. 980-981. An examination of the testimony of plaintiff quoted supra does not disclose a misrepresentation of fact or of law, nor does it disclose a threat of an illegal act. The statement that plaintiff would be paying deficiencies all his life could not be said to be a misrepresentation of an existing fact. The statement seems but a forecast or warning of the prospect of a deficiency, a possible situation after sale of the collateral.

The quoted language of defendant Locatell might be said to constitute a threat rather than a misrepresentation of fact. The common law doctrine of duress has so gradually expanded and broken through its original limitations that, as a general rule in this country, "the payment of money or the making of a contract may be under such circumstances of business necessity or compulsion as will render the same involuntary and entitle the party so coerced to recover the money paid, or excuse him from performing the contract." 17 Am. Jur., Duress and Undue Influence, Sec. 7, p. 879; Furman v. Gulf Ins. Co. of Dallas, 152 F. 2d 891; White v. Scarritt, 341 Mo. 1004, 111 S. W. 2d 18; White v. McCoy Land Co., 229 Mo. App. 1019, 87 S. W. 2d 672; Annotation 79 A. L. R., p. 655 et seq; and compare Wood v. Kansas City Home Tel. Co., 223 Mo. 537, 123 S. W. 6. But, it is said that threats do not constitute actionable duress unless they are wrongful, even though they exert such pressure as to preclude the exercise of free judgment. Vol. IV, Restatement of the Law of Torts, Sec. 871, Comment f.

It is unnecessary in the instant case to search for the limits of the modern expansion of the field of duress which "expansion" is said to be still in a "fluid state." Furman v. Gulf Ins. Co. of Dallas, supra; Annotation 79 A. L. R., supra. Plaintiff has not urged duress as the basis of his claim. He has urged he was deceived by false representations into assigning his interest in the partnership adventure, which theory presupposes he made the assignment voluntarily. He has not contended defendants, in the circumstances of his financial situation, wrongfully coerced him into (involuntarily) assigning his interests. While duress has been said to be a species of fraud, yet there is a clear distinction between them. In fraud the party defrauded acts willingly because of the false representation made to him by the defrauding party, the falsity of the representation not being known to the party defrauded; in duress the victim acts

knowingly but unwillingly because of the coercion exercised upon him. Coleman v. Crescent Insulated Wire & Cable Co., 350 Mo. 781, 168 S. W. 2d 1060; Security Sav. Bank v. Kellems, Mo. App., 274 S. W. 112 (transferred to this court, Security Sav. Bank v. Kellems, supra); 17 Am. Jur., Duress and Undue Influence, Sec. 2, pp. 873-874; 9 R. C. L., pp. 711-712.

The judgment should be affirmed.

It is so ordered. *Bradley* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.